1

```
1              UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF NEW YORK
2    - - - - - - - - - - - - - - - X
                                    :
3      PAGANAS,                     :  15-CV-5424 (JBW)
                                    :
4              Plaintiff,           :
                                    :
5                                   :  United States Courthouse
           -against-               :  Brooklyn, New York
6                                   :
                                    :
7      TOTAL MAINTENANCE            :  October 17, 2016
       SOLUTION, LLC et al.,        :  11:30 a.m.
8                                   :
               Defendant.           :
9    - - - - - - - - - - - - - - - X
```

```
10           TRANSCRIPT OF CIVIL CAUSE FOR MOTION
          BEFORE THE HONORABLE JACK B. WEINSTEIN
11              UNITED STATES DISTRICT JUDGE
```

```
12                  A P P E A R A N C E S:

13   For the Plaintiff:    LAW OFFICE OF ROBERT S. POWERS
                               1540 August Road
14                             North Babylon, New York 11703
                           BY:  ROBERT S. POWERS, ESQ.
15

16   For the Defendant     MILMAN LABUDA LAW GROUP PLLC
     Third-Party Plaintiff:    3000 Marcus Avenue
17                             Suite 3W3
                               Lake Success, New York 11042
18                         BY:  PERRY S. HEIDECKER, ESQ.

19   For the Third-Party   DAVIS WRIGHT TREMAINE LLP
     Plaintiff:                1251 Avenue of the Americas
20                             21st Floor
                               New York, New York 10020-1104
21                         BY:  LYLE ZUCKERMAN, ESQ.
                               SCOTT COOPER, ESQ.
22
     Court Reporter:       Marie Foley, RMR, CRR
23                         Official Court Reporter
                               Telephone: (718) 613-2596
24                             Facsimile: (718) 613-2648
                               E-mail:  Marie_Foley@nyed.uscourts.gov
25   Proceedings recorded by computerized stenography.  Transcript
     produced by Computer-aided Transcription.
```

*Proceedings*                                                      2

1              (In open court.)

2              COURTROOM DEPUTY:   All rise.   Civil cause for

3      motion, Paganas versus Total Maintenance Solution, LLC.

4              Counsel, note your appearance, please.   For the

5      plaintiff.

6              MR. POWERS:   For the plaintiff, Robert S. Powers,

7      1540 August Road, North Babylon, New York  11703.

8              THE COURT:   Where's Mr. Paganas?

9              MR. POWERS:   He's working today.

10             THE COURT:   Didn't I ask that he be here?

11             Did we ask that he be here?

12             THE CLERK:   I'll check the original order.

13             (Pause.)

14             THE COURT:   Is he available by telephone?

15             MR. POWERS:   Yes, I believe.   Yeah.

16             THE COURT:   All right.   We'll take the other

17     appearances.

18             MR. HEIDECKER:   Your Honor, for the defendant Total

19     Maintenance Solution, Reggie Tartagglione and Aron Weber, the

20     law firm of Milman Labuda Law Group by Perry Heidecker, 3000

21     Marcus Avenue, Lake Success, New York.   To my right is Mr.

22     Reggie Tartagglione, who's an individually named defendant and

23     a member of defendant limited liability company.

24             MR. TARTAGGLIONE:   Good morning.

25             THE COURT:   Good morning.

*Proceedings*                                                        3

1          MR. ZUCKERMAN:  Good morning, Your Honor.  Lyle

2    Zuckerman from the law firm of Davis Wright Tremaine on behalf

3    of St. John's University, and I'm here with my colleague Scott

4    Cooper from the same law firm.

5          THE COURT:  Thank you.

6          Item 29, 2/22/2016, St. John's motion to dismiss,

7    plaintiff shall be present.

8          I suppose you didn't read that as requiring him to

9    be present today?

10         MR. POWERS:  I think that was a prior motion, Your

11   Honor.

12         THE COURT:  Yes, okay.

13         MR. POWERS:  I don't recall on this particular

14   motion.

15         THE COURT:  We usually require that.  It's going to

16   be difficult to deal with the problems I have with this case

17   without his being present.

18         Well, whose motion?

19         MR. HEIDECKER:  Your Honor, there are two motions

20   before the Court today.

21         THE COURT:  Yes.

22         MR. HEIDECKER:  The first is the motion by

23   defendants against the plaintiff for failure to state a cause

24   of action.

25         THE COURT:  You still keep saying "failure to state

*Proceedings*                                                    4

1    a cause of action."  I'm not interested in that.  This is a

2    motion, as I understood it, for summary judgment.

3              MR. HEIDECKER:  Yes.

4              THE COURT:  Is it not?

5              MR. HEIDECKER:  Yes.

6              THE COURT:  A failure to state a cause of action has

7    got nothing to do with this.  That's why I wanted the

8    plaintiff here, because it's the facts now that count, not the

9    allegations.

10             But go ahead.  I'm sorry I interrupted you.

11             MR. HEIDECKER:  That's quite all right, Your Honor.

12             Your Honor, the facts as adduced in discovery show

13   that plaintiff pleaded that he only had -- that he worked a

14   set amount of overtime typically in each week of his

15   employment.  When he was deposed, he said that other than his

16   general memory, he had no other way to fix the amount of

17   overtime he worked.  And when the defendants demanded

18   documents from the plaintiff, he said he had no documents.

19             Therefore, not only did that not satisfy any of the

20   requirements that the Second Circuit set forth in the trilogy

21   of Nakahata, Lundy and Dejesus, it would render any claim for

22   damages speculative.  Therefore, we move for summary judgment.

23             In response to our motion, all of a sudden for the

24   first time in late December when there was a trial date

25   already set and when discovery had been long closed, we

*Proceedings*                                                     5

 1  received time records from the plaintiff.  His deposition had

 2  never been supplemented or corrected.  His document production

 3  had never been supplemented or corrected.  And we respectfully

 4  argue to the Court that we're being irrevocably prejudiced by

 5  being sandbagged at the last moment.

 6           THE COURT:  Well, you could have called them for the

 7  deposition.  I'm not holding out any critical evidence.  The

 8  rules require that the cases be decided on the merits wherever

 9  possible.  So your not having information, if you want to take

10  further deposition using that information, you're free to do

11  so.

12           MR. HEIDECKER:  Thank you, Your Honor.

13           THE COURT:  Do it immediately.

14           MR. HEIDECKER:  Will that affect the trial date?

15           THE COURT:  What's the trial date now?

16           MR. HEIDECKER:  November 14.

17           THE COURT:  No.  Just do it right away.

18           Now, I just can't deal with this motion without the

19  plaintiff being present.  I want to know what he was doing in

20  essentially, as I understand it, the same job supervising

21  these cleaners at St. John's.

22           That is the case, wasn't it?  You had prior

23  contracts equivalent to the ones that the Total Maintenance

24  had here?

25           MR. ZUCKERMAN:  If you're asking whether St. John's

*Proceedings*                                                    6

1    engaged prior contractors to perform similar services, the

2    answer is yes.

3              THE COURT:  Yes.  So you were using a contractor,

4    essentially, on a cost plus three percent basis, as I

5    understand all of the evidence now before me.

6              MR. ZUCKERMAN:  This contract, yes.  I don't know

7    what the answer is with respect to prior contractors.

8              THE COURT:  All right.  Was he working for a prior

9    contractor at St. John's?

10             MR. POWERS:  Yes, several.

11             THE COURT:  What was he getting paid, as a worker or

12   an executive?

13             MR. POWERS:  Well, they were paying different.

14   There were times when he was getting overtime.  There was

15   times when he wasn't.

16             THE COURT:  What was he doing when he wasn't getting

17   overtime?

18             MR. POWERS:  Well, there were times when he was

19   getting an hourly wage during the course of his -- he worked

20   there for almost 30 years.  There were times when he was

21   getting an hourly and sometimes he was getting what is

22   classified as a salary.

23             THE COURT:  On what basis was he getting a salary?

24   As an executive and a supervisor?

25             MR. POWERS:  Well, we don't know what they

*Proceedings*                                                        7

1    classified it.  I'm assuming they classified him --

2              THE COURT:  Well, what was he doing?  Do you know?

3              MR. POWERS:  He was doing the same thing.  He was

4    maintaining the buildings.

5              THE COURT:  How many people did he have that were

6    working under him?

7              MR. POWERS:  Well, they weren't really working under

8    him.  They were union employees.  He was a nonunion employee.

9    The porters that worked in the buildings were union employees

10   and he was responsible for, depending different times

11   different companies, he worked for maybe four buildings, five

12   buildings, six buildings.

13             THE COURT:  How many people were actually doing the

14   sweeping and the cleaning up in the buildings that he was

15   responsible for.

16             MR. POWERS:  It could have been four or five.

17             THE COURT:  You don't know.

18             MR. POWERS:  Well, it's different times --

19             THE COURT:  It's critical here.

20             Did he ever recommend that somebody was doping off

21   on the job and should have been fired?

22             MR. POWERS:  No.  There was -- he testified that he

23   was not involved in discipline or hiring or firing anyone.

24             THE COURT:  Did he tell them what to do?

25             MR. POWERS:  Only in the sense that if he had an

*Proceedings*                                                                8

1   event and he had to put tables or chairs or set up a screen,

2   he would say we have to put the tables.

3              THE COURT:  And tell them where to put it.

4              MR. POWERS:  Well, and he would work with them.  He

5   would set the tables up with them.

6              THE COURT:  Did he tell them where to put it?  And

7   how many people are we dealing with?

8              You say 90 percent, I think in the papers, of his

9   time was actually doing the what I'll call the menial type of

10  work.

11             MR. POWERS:  Right.

12             THE COURT:  But that doesn't make sense, unless we

13  know how many people he had here.

14             The facts here resolve the case.  I hate to bring in

15  other attorneys, but I can't proceed without knowing what he

16  did, how many people he had under him.  Was he doing it

17  differently this time.  His compensation is roughly double

18  that of even the union employees here, that suggests a

19  supervisor.

20             When you have a man or woman who's effectively

21  supervising the job, if he sees somebody he's supervising

22  having trouble sweeping up or polishing something, he gives it

23  a hand as a person loyal to his employer.  That's common

24  practice of supervisors.

25             It's very frustrating.

*Proceedings*                                                              9

1          What do you want me to do?

2          I think under the contract, in any event, assuming,

3    just assuming for the sake of argument that we're going to

4    find that he was not exempt, which seems dubious to me at the

5    moment, that he was not exempt and he should have gotten

6    X-amount of overtime, he should have been paid the X-amount

7    and then that would have been billed to St. John's, plus three

8    percent, right?

9          MR. ZUCKERMAN:  No, Your Honor, because we, St.

10   John's, would meet with TMS each week and we would go over

11   with them exactly what work was going to be performed.  They

12   billed us for the cost of that work, meaning the labor,

13   supplies, et cetera, plus three percent.

14         To the extent that the plaintiff is owed any money

15   here, it's not as the result of him performing services for

16   which we were responsible for paying costs.

17         THE COURT:  Why not?

18         MR. ZUCKERMAN:  Because we paid his salary.  We paid

19   that cost.  The only way liability --

20         THE COURT:  No, but if I find that as a matter of

21   fact he was a working employee, not a supervisor, therefore

22   not exempt, you were not paying the full cost that you should

23   have paid.

24         MR. ZUCKERMAN:  But we --

25         THE COURT:  I'm not talking about penalties or

*Proceedings*                                                10

1   anything like that.  I'm just talking about out of pocket.

2   But that would require me to find that the plaintiff should

3   have been paid X-dollars for overtime, which if they had paid

4   it would have been billed to you.

5           MR. ZUCKERMAN:  But we would have staffed the job

6   differently, Your Honor, perhaps.

7           What's key here is that we contracted with TMS to

8   lawfully employ these folks, and part of their obligation is

9   to properly classify them.  They continue to take the position

10  today that he was properly classified.  If they had done their

11  job --

12          THE COURT:  Right, but I may hold, on the basis of

13  the trial, that they weren't classified properly and they

14  should have billed you for more; they didn't bill you for

15  enough.

16          MR. ZUCKERMAN:  In which case they violated the wage

17  and hour laws, just like any other employment law, for which

18  St. John's was indemnified.  It is a one-way indemnification.

19          So our liability, our client's liability, if at all,

20  arises from their unlawful conduct, not the failure to pay

21  wages.  It's completely different.  Otherwise, they would be

22  incentivized to do all sorts of things that would be

23  prohibited by the contract and then try to hold us liable at

24  the end of the day, saying it falls under the definition of

25  costs.

1          THE COURT:  Well, it's not a question of liability.

2     It's a question of how much they should have paid at the

3     moment.

4          MR. ZUCKERMAN:  They should have paid, correct,

5     because if we knew that this person was improperly classified,

6     we would have said, for example, we don't want anyone working

7     overtime.  Which we do all the time, we the client, St.

8     John's, do all the time.  We say don't man the job with 50

9     employees at overtime; add another two or three so we can

10    avoid the cost of overtime.  They've deprived us of that.

11    They made their own judgment about the classification.  If

12    they're wrong, they violated the law for which we, St. John's,

13    are indemnified.

14         THE COURT:  Now, whose checks did these employees

15    receive?

16         MR. POWERS:  He was paid by TMS.

17         THE COURT:  Plaintiff?

18         MR. POWERS:  Plaintiff was paid by TMS.

19         THE COURT:  And the workers, I'll call them the

20    workers who did the work.

21         MR. POWERS:  Well, there's two different -- it's a

22    little more complicated than that because the people at the

23    building that he worked at, I'll call it -- we'll call it

24    during the regular daytime hours, they were porters, they were

25    TMS employees.  When he did events, if he had to do the alumni

*Proceedings*                                                    12

```
 1   hall or the basketball game, the employees for that event were
 2   another company.  It was Metro -- Metro something or other,
 3   which would not --
 4            THE COURT:  On the same kind of basis, cost plus?
 5            MR. POWERS:  Well, no, their contract was not --
 6   well, I think it was cost plus, but it was a little different
 7   than TMS.
 8            But anyway, they had an agreement with, Metro had an
 9   agreement with St. John's, and on those events he was
10   basically the only employee of TMS that was working those
11   events.
12            THE COURT:  Well, putting aside your argument, which
13   is a powerful argument, what was happening over there?  Was
14   this plaintiff supervising these employees, or were you?  What
15   was happening?
16            MR. ZUCKERMAN:  No, we weren't, Your Honor.
17            As we understood it, and have always understood it,
18   there were five or six supervisors who supervised the work of
19   over a hundred Local 32BJ unionized employees, and Mr. Paganas
20   was one of them.
21            THE COURT:  And this was one of the five, plaintiff?
22            MR. ZUCKERMAN:  Correct.
23            THE COURT:  Was he doing the same work as the other
24   four?
25            MR. ZUCKERMAN:  Other than on the basis as Your
```

*Proceedings*                                                              13

1    Honor speculated, which would be to chip in from time to time,

2    no, that would be a violation of the 32BJ contract, and we

3    certainly weren't aware of any.  I'm not aware of any

4    grievances.

5            THE COURT:  I see.  So, the usual situation is if

6    somebody wants to pick a piece of paper off the floor and he's

7    not the union person, he can't do it.

8            MR. ZUCKERMAN:  Well, I think 32BJ is a little bit

9    more lenient than that, but you're --

10           THE COURT:  But that's the general position in New

11   York.

12           MR. ZUCKERMAN:  Your Honor understands.

13           And by the way, TMS testified at the 30(b)(6)

14   deposition that they were supervisors and they did do

15   supervisory work.  So they're still purporting to St. John's,

16   and we have no reason to doubt them, that they were

17   supervisors at all times.  And they've billed us, St. John's,

18   as if he was a supervisor.  We've paid those invoices, so

19   we've paid the costs.

20           THE COURT:  At double what the actual workers made.

21           MR. ZUCKERMAN:  The actual rate.  We could have had

22   more than two other people working without incurring the

23   overtime on the job, and that's why their argument that the

24   damages that would flow from this trial are costs just doesn't

25   pass the test.

*Proceedings*                                                    14

1              THE COURT:  I understand your position.

2              MR. ZUCKERMAN:  Thank you, Your Honor.

3              MR. HEIDECKER:  Your Honor, may we be heard?

4              THE COURT:  Of course.

5              MR. HEIDECKER:  St. John's argues that like they

6     were innocent bystanders while Total had total control of the

7     field.  That's not the way it was at all.  The record shows

8     that there was a succession of cleaning and maintenance

9     contracts.

10             THE COURT:  Yes, I understand that.  This plaintiff

11    worked through those.

12             MR. HEIDECKER:  That's correct.

13             And, Your Honor, in order to insure continuity, it

14    was requirement imposed by St. John's that the same people be

15    employed in the same positions.

16             THE COURT:  As supervisors?

17             MR. HEIDECKER:  And the bargaining unit workers,

18    Your Honor.

19             St. John's told us who to take, told us how much to

20    pay them, and set forth the work that they wanted done under

21    the contract.  So they were the controlling agency, Your

22    Honor, not an innocent bystander.

23             THE COURT:  But whose check was paying these people?

24             MR. HEIDECKER:  We paid them under Total checks,

25    Your Honor.

*Proceedings*                                                    15

1          THE COURT:  Then they were your employees here.

2          MR. HEIDECKER:  We're not disputing that they were

3     our employees.

4          What we are saying is that St. John's is not the

5     victim because, as our customer --

6          THE COURT:  And if they're your employees, you had

7     the obligation to pay them properly.

8          MR. HEIDECKER:  Your Honor, we paid them what St.

9     John's told us to pay them.

10         THE COURT:  St. John's isn't the law.  They can't

11    tell you to do the wrong things and get away with it.

12         If he was not supervising and was working over 40

13    hours, earning overtime and hourly time under the New York

14    law, you had the obligation to pay and bill them.

15         MR. HEIDECKER:  Your Honor, we had every reason to

16    believe, by the history, by the practice on the premise, and

17    by the direction of St. John's, that these were exempt

18    supervisors.  There was no reason for us not to believe that

19    they were not exempt.

20         THE COURT:  Well, what caused you to believe that?

21         MR. HEIDECKER:  Well, first of all, when we

22    inherited them, they were salaried.

23         Second, the duties.

24         THE COURT:  Was he always paid a salary by these

25    prior subcontractors?

*Proceedings*                                                    16

1          MR. POWERS:  His testimony was there was some that

2     he was and some that he wasn't.

3          MR. HEIDECKER:  Our immediate predecessor paid him

4     on a salary.

5          MR. ZUCKERMAN:  Clearly we didn't, St. John's did

6     not dictate that of prior --

7          THE COURT:  Excuse me.

8          Well, there's an in limine motion to exclude that

9     from evidence.  I'm not going to exclude it because it seems

10    to me, if we go forward at all, it seems to me that it is

11    admissible to show his, the plaintiff's, state of mind and for

12    no other reason, as understanding that he was working there as

13    an executive, not as a worker under the law, entitled to

14    time-and-a-half with problems of laches, estoppel.

15         MR. HEIDECKER:  All which we've pled, Your Honor.

16         THE COURT:  Yes, I know.

17         We're playing Hamlet here without Hamlet.  He's the

18    man that knows what he was doing all this time and who was

19    telling him what to do.  I'm just wondering whether we should

20    adjourn this for tomorrow and get him here.

21         What do you think?

22         MR. ZUCKERMAN:  Your Honor, the plaintiff has not

23    filed a claim against St. John's.  We're not alleged to be

24    joint employers or co-employers.  So I think the issue that

25    you have with respect to questions of fact concern the claim

*Proceedings*                                                            17

1   of the plaintiffs and the defendants, not St. John's.

2          THE COURT:  Well, I understand, but that's assuming

3   that I don't buy your argument and that the Court of Appeals

4   doesn't buy your argument that St. John's was complicit to

5   this failure.

6          MR. ZUCKERMAN:  There's no -- I'm sorry.

7          THE COURT:  I'd rather go on both grounds.  If he's

8   going to be exempt, I'd rather do it on that ground, as well

9   as the ground that you are relying on, which makes sense of

10  course.  The contract is clear on indemnification.

11         MR. HEIDECKER:  Your Honor, with respect --

12         THE COURT:  The indemnification runs to St. John's,

13  not from St. John's.

14         MR. HEIDECKER:  Your Honor, we are not saying that

15  St. John's owes us indemnification.  The indemnification in

16  the contract protects St. John's from claims by third parties

17  or entities.  We're not a third party.  If their

18  interpretation were adopted, we could never sue St. John's for

19  breach of the contract because they --

20         THE COURT:  Yes, you could.  If they didn't pay your

21  bills, you could sue them for failing to comply with their

22  agreement, which was to pay you on costs plus three percent.

23         MR. HEIDECKER:  Your Honor, rather, our claim is

24  based on the simple formula in the contract that they have to

25  reimburse us for the cost of wages and benefits.

*Proceedings*                                                            18

1        THE COURT:  What do we have on tomorrow?

2        COURTROOM DEPUTY:  Just one sentencing at 10:30.

3        MR. HEIDECKER:  Your Honor, my client tells me he's

4   not available tomorrow.

5        THE COURT:  All right.  What have you got to say?

6   What was happening?

7        MR. TARTAGGLIONE:  There's just something that I

8   can't wrap my mind around.  I'm not a lawyer.  I don't

9   understand this legal stuff.

10        THE COURT:  Whose company were you running?

11        MR. TARTAGGLIONE:  TMS.

12        The obstacle that I have, the thing that I can't get

13   over in my head, usually when an employee is an exempt

14   employee, that's a nonunion employee?  The supervisor is

15   exempt or not exempt?

16        MR. HEIDECKER:  Exempt generally.

17        MR. TARTAGGLIONE:  Okay.  Usually when they have a

18   complaint, it doesn't go anywhere.  At the time of employment,

19   they would probably go to the NLRB and get them involved to

20   try to figure out --

21        THE COURT:  Forget the NLRB.

22        MR. TARTAGGLIONE:  I'm just trying to figure out how

23   seven years we're there and not a word is said about it.  Then

24   we leave, he gets fired, and all of a sudden we're in court.

25        THE COURT:  Why was he fired?

1          MR. TARTAGGLIONE:  Not from me.

2          MR. HEIDECKER:  By the next successor employer.

3          THE COURT:  By the next successor.

4          MR. TARTAGGLIONE:  I just don't -- I just can't

5    figure that out.  Why wait seven years?

6          THE COURT:  Well, that's another problem, a statute

7    of limitations problem.

8          MR. TARTAGGLIONE:  It just don't feel right.

9          THE COURT:  How many employees did you have on the

10   buildings that he was --

11         MR. TARTAGGLIONE:  He probably had about four or

12   five employees times four buildings.

13         THE COURT:  Under him?

14         MR. TARTAGGLIONE:  Four or five employees under him

15   on each building.

16         THE COURT:  On each building?

17         MR. TARTAGGLIONE:  On each building.

18         THE COURT:  And how many buildings?

19         MR. TARTAGGLIONE:  Probably four or five.

20         THE COURT:  So he's got about 20 people.

21         MR. TARTAGGLIONE:  That's correct.  And he was what

22   we call a manager.  He would go out and manage people and

23   supervise people and get things done.  He was never directed

24   to do work.

25         THE COURT:  Did you ever have him say that X is not

*Proceedings*                                        20

1   doing the job --

2              MR. TARTAGGLIONE:  Yes.

3              THE COURT:  -- you ought to fire him?

4              MR. TARTAGGLIONE:  Yes.

5              THE COURT:  And what did you do?

6              MR. TARTAGGLIONE:  Well, we took action.  We

7   followed up on things.

8              We have the manager at the time, Rich Rossi, already

9   said that yes, he did recommend terminations of people, he did

10  talk about disciplines of people.  That's sort of what he was

11  there for 'cause as a manager, as a site manager, you can't

12  see everything.  So you use those people to report back.

13             THE COURT:  So, what did you have?  You had a site

14  manager for all the buildings?

15             MR. TARTAGGLIONE:  We had a site manager for all the

16  buildings, correct.

17             THE COURT:  And then you had these, in your

18  estimations, these sub-supervisors.

19             MR. TARTAGGLIONE:  That's correct.

20             THE COURT:  Who supervised the people that actually

21  did the work.

22             MR. TARTAGGLIONE:  At one time, there was I think

23  seven of them.  At one time, there was seven supervisors.

24             As far as the events go, he wasn't the only one

25  doing events.  There was another fellow there, a Tony Tetro,

*Proceedings*                                                       21

 1   that was doing the events while --

 2              THE COURT:  Supervising.

 3              MR. TARTAGGLIONE:  Yes.

 4              THE COURT:  All right.  As of this moment, the

 5   information I have doesn't permit me to find that he was not

 6   exempt.  If you want to come in tomorrow with him and I'll

 7   question him, maybe he can convince me.

 8              MR. HEIDECKER:  Your Honor, with respect, I have two

 9   principals, Mr. Tartagglione --

10              THE COURT:  I don't need him anymore.

11              MR. HEIDECKER:  Well, I think he has a right to be

12   here.

13              MR. TARTAGGLIONE:  No, that's okay.  I'm okay.

14              THE COURT:  He can be here, but I'm not ordering him

15   to be here.

16              MR. HEIDECKER:  And Mr. Weber, the other one, is an

17   Orthodox Jew, and today is a Jewish holiday, as is tomorrow.

18              MR. TARTAGGLIONE:  It's okay.

19              THE COURT:  I'm not going to be here Wednesday for

20   this.

21              MR. ZUCKERMAN:  Tomorrow's fine for us, Your Honor.

22              THE COURT:  You want to bring him in tomorrow?

23              MR. POWERS:  I'll bring him in, Your Honor.

24              THE COURT:  As of this moment, you're out of court.

25   The evidence is just overwhelming that he was a supervisor.

*Proceedings*                                                  22

1         MR. POWERS:  Well, the motion of defendant was with

2    respect to the hours.  They didn't make a motion with

3    respect -- their affirmative defense, they didn't even

4    raise --

5         THE COURT:  I don't care what the motion is.  If he

6    was as exempt, you don't have a case.

7         Isn't that the position of everybody here?

8         MR. ZUCKERMAN:  Yes, Your Honor.

9         MR. HEIDECKER:  Yes, Your Honor.

10        THE COURT:  So it appears from all of the evidence

11   fairly clear that he was a supervisor.  If he picked up a

12   broom occasionally while a union agent wasn't watching or

13   picked up the end of a table to help somebody, which was

14   undoubtably a union violation, that doesn't make him a worker.

15   Even judges pick up paper when they see it on the floor.

16        MR. HEIDECKER:  Does the union know about that?

17        THE COURT:  I'm not getting time-and-a-half.  If I

18   got time-and-a-half, it would break the government.

19        MR. POWERS:  You have a different exemption, Your

20   Honor.

21        THE COURT:  True.

22        You want to bring him in tomorrow and we'll get the

23   fingers out.  I'm reluctant not to give him a chance to tell

24   us what it is because the case is almost open and shut on him,

25   the evidence that we have here.

*Proceedings*                                                23

1          You want to come in tomorrow?

2          MR. HEIDECKER:  Yes, Your Honor, we serve the

3    convenience of the Court.

4          THE COURT:  9:30.  Get in here 9:30?

5          MR. TARTAGGLIONE:  I'll get here.

6          THE COURT:  So we'll adjourn it to 9:30 tomorrow.

7          All right.  Any documents or pieces of deposition or

8    anything you want to show me on this what I consider critical

9    issue, let's have it because on the face of this, there's

10   nothing here.  And it's not as if he weren't well advised of

11   what his status was because a prior contractor did the same

12   thing.

13         Well, thanks very much, gentlemen.  I'll see you at

14   9:30 tomorrow.

15         MR. HEIDECKER:  Thank you, Your Honor.

16         THE COURT:  But go through the records.  See what

17   you can do on this point because it just doesn't seem right to

18   me.

19         Thanks very much.

20         MR. ZUCKERMAN:  Thank you.

21         THE COURT:  Order immediate copy from St. John's.

22         (Time noted:  12:10 p.m.)

23

24

25